UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANK L. MARVIN,

      Plaintiff,

v.                                    Case No. 05-70367

CITY OF TAYLOR, DON HELVEY,         HONORABLE AVERN COHN
MATT MINARD AND JEFFREY SHEWCHUK,

      Defendants.

_____/

**MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I. Introduction**

This is a case under 42 U.S.C. § 1983. Plaintiff Frank L. Marvin (Marvin) is suing the City of Taylor (City), Don Helvey (Helvey), Commander of the Taylor Police Department, and Taylor police officers Matt Minard (Minard) and Jeffrey Shewchuk (Shewchuk), and John Doe officers, claiming (1) use of excessive force during Marvin's arrest, (2) failure to train officers and adopt adequate policies and procedures, and (3) state law assault and battery.[1]

Before the Court is the Defendants' Motion for Summary Judgment. The Court held oral argument at which it invited defendants to file a supplemental paper particularly with regard to Taylor's training and supervision of its police officers. Marvin responded to the supplemental papers and defendants filed a reply. The matter is now

---

[1]Following the filing of defendants' motion for summary judgment, Marvin agreed to dismiss his claims for denial of reasonable medical care (count 2) and violation of due process (count 4). Accordingly, these claims are DISMISSED.

ready for decision.  For the reasons that follow, the motion is GRANTED IN PART and

DENIED PART.

## II. Background[2]

### A.

On July 11, 2004, at approximately 9:00 p.m., Marvin was driving through Taylor,

Michigan and struck the rear end of Helvey's automobile while it was stopped at a red

traffic light.  Helvey was operating his personal automobile with his wife and four

children as passengers and was not on duty.  After the initial incident, Marvin and

Helvey stopped and exited their respective automobiles.  At that time, Helvey noticed

that Marvin was likely intoxicated and called the Taylor Police Department (TPD).

Minard was the first to arrive at the scene followed by Shewchuk.  Minard saw that

Marvin was intoxicated and performed a series of field sobriety tests.  Afterward, Minard

read Marvin his preliminary breath test rights and administered the breath test.  The

breath test showed Marvin registering 1.72, which is above the legal limit.  Minard

placed Marvin under arrest and ordered that he turn around and place his arms behind

his back to be handcuffed.

The parties offer diverging accounts of the handcuffing incident.  Minard and

Shewchuk say that Marvin resisted by locking his arms in front of his chest rather than

behind his back, accordingly, each officer restrained one of Marvin's arms in an attempt

to secure him.  Minard says that he did not hear Marvin request that he be handcuffed

_____

[2] The background is taken from the parties' papers, primarily Defendants'
Statement of Material Facts Not in Dispute and Marvin's Counter-Statement of Disputed
Facts.

in front of his body for medical reasons and that Marvin was simply resisting being handcuffed. As the officers attempted to handcuff Marvin, Helvey approached the three men to assist in the handcuffing.  When Helvey approached, Minard and Shewchuk say that Marvin kicked Helvey in the shin.  They say that Marvin yelled profanities throughout the entire handcuffing process, which lasted approximately 40-45 seconds.

Marvin's account of the handcuffing differs.  Marvin says that he informed the officers that he suffered from spinal stenosis, a disorder which prevented him from crossing his arms behind his back.  He says that he requested that the officers accommodate his needs by restraining his hands in front of his body, but that Minard said, "[p]ut your arms behind your back or we will do it for you."  Marvin says that Minard then kicked Marvin's leg, handcuffed him behind his back, and forced him onto the patrol car, knocking his glasses off.  Marvin says that the force of all three officers then forced his arms behind his back, fracturing his right shoulder, tearing and dislocating other tendons and muscles.  He says that he screamed in pain as the officers handcuffed him, but that they did not diminish their force.  Marvin, however, denies both kicking Helvey in the shin and shouting profanities.

The parties agree that once Marvin was handcuffed, he was placed in the back of the patrol car.  They also agree that Minard proceeded to search Marvin's automobile in which he discovered a gun and small two dogs.  Marvin admits that he did not have a permit to carry a concealed weapon.  The parties further agree that Helvey only made contact with Marvin when he assisted in the handcuffing, and that Helvey then left the scene and did not visit Marvin in the jail.

The parties disagree about the role of a witness, Stanley Roman (Roman).  The

3

officers say that Roman was an independent witness to the incident who was sitting on his front porch, near the accident, when the officers arrived at the scene.  Roman says that he saw the arrest in progress and walked over to ascertain what was happening. He says that as he approached Marvin noticed him and shouted, "[l]ook what these sons of bitches are doing to me."  Roman says that as Marvin was shouting at him, the officers were merely attempting to talk to Marvin.  Roman also says that when the officers administered the field sobriety tests, Marvin yelled, "[h]ey, look what these bastards are doing to me."  Roman says that he witnessed Marvin "almost falling over" as the officers executed the sobriety tests, and that the they used a great deal of restraint in dealing with him.  Roman says that he did not believe that the officers were acting improperly, and that Marvin was uncooperative, resistive, and obnoxious.

Marvin disagrees with Roman's account of the facts surrounding his arrest.  First, Marvin denies that Roman was a witness to the event.  Second, Marvin says that Roman testified that the man he saw being arrested was in his forties or fifties, and that he was 78 years old at the time of the arrest.  Additionally, Marvin contends that neither Minard nor  Helvey recognized Roman as being at the scene of the accident when he gave his deposition.  Marvin also denies using profane language during his sobriety tests for the reason that he did not become agitated until the officers attempted to handcuff him and that his account of the event is corroborated by Minard's deposition.

After the arrest, Minard and Shewchuk escorted Marvin to the Taylor Police Station.  Marvin says that when they arrived at the station the officers unreasonably pulled him from the patrol car, rather than allowing him to exit under his own power. The officers then moved Marvin to the police station booking room where Minard says

4

2:05-cv-70367-AC-DAS  Doc # 21  Filed 06/26/06  Pg 5 of 22  Pg ID 501

Marvin became resistive and his verbal abuse grew more intense. Marvin, nevertheless, denies that he was resistive or combative. In the booking room, Marvin says that Minard and Shewchuk continued to use excessive force in removing his handcuffs and unnecessarily ripped his pants when removing his belt.

Afterward, the officers moved Marvin to cell seven and asked him to submit to a chemical test. The officers say that Marvin agreed at first, but then told Minard, "[y]ou suck my ass" while kicking him. The officers then forced Marvin to the ground. Marvin denies that he kicked Minard.

After Marvin refused to take the chemical test, the officers left him in the cell to obtain a search warrant compelling Marvin to submit to a blood test. After the search warrant was issued, the officers took Marvin to the clinic for the blood draw. The officers say at that time, Marvin was able to place his arms behind his back voluntarily without visible difficulty as they handcuffed him. In the clinic, the officers say that Marvin again became combative. When Shewchuk removed Marvin's handcuffs for the blood draw, Marvin struck Shewchuk in the chin with a closed fist. Other officers restrained Marvin and drew his blood. Marvin says that at the clinic, the officers wrenched his broken shoulder, which caused him extreme pain. Marvin says that due to the intensity of the pain he became angry and swung at one of the officers but does not remember whether or not he made contact. The blood test results showed that Marvin had a blood alcohol level of .18. When the clinic finished the blood draw, the officers returned Marvin to a cell and obtained his photograph in preparation for booking.

During booking, Marvin complained of shoulder pain. The TPD called EMS for

5

medical treatment, but says that Marvin refused assistance and asked only for Aleve or Motrin.  TPD says that Marvin told EMS that he would see his doctor after he was released.  Marvin, however, says that did not refuse medical care, but that he did notify EMS that he would see his doctor after his release.  While detained, Marvin also says that he instructed the officers that he required medication, which they denied him.  Marvin says that because the officers deprived him of his medication, he subsequently suffered a heart attack.[3]

The day after Marvin's arrest, Detective Don Farago (Farago) was assigned to investigate the case against Marvin.  Farago read Marvin his constitutional rights and conducted an interview.  Marvin told Farago that he consumed three shots of vodka at approximately 3 p.m. on the day he was arrested.  Marvin further described to the detective that he left home at approximately 5 p.m. to drive to Taylor.  Marvin stated that he was driving on Ecorse Road and struck the rear end of Helvey's vehicle because it stopped suddenly.  Marvin admitted to Farago that he was uncooperative with the Minard and Shewchuk at the clinic because they continued to inflict pain on his shoulder.  Nevertheless, Marvin denied that he was difficult during the arrest.

After the investigation, Marvin was charged with assault and battery on a police officer, driving a motor vehicle while intoxicated, and carrying a concealed weapon.  Marvin plead guilty to assaulting, resisting and obstructing, and to operating a motor vehicle while impaired.  The record does not indicate what was said at the plea hearing or the sentence Martin received.

---

[3] This statement is contained in the complaint.  However, it was unclear when and if Marvin suffered the heart attack.

**B.**

On February 1, 2005, Marvin filed this action claiming: (1) excessive use of force during Marvin's arrest, (2) denial of reasonable medical care, (3) failure to train officers and adopt adequate policies and procedures, (4) denial of due process, and (5) a state claim of assault and battery.

Defendants then filed the instant motion.  As stated above, see supra n. 1, Marvin agrees to dismiss his claims of denial of reasonable medical care and denial of due process.  Thus, the only claims before the Court are his claims of excessive force against the officers, failure to train officers and adopt adequate policies against the City of Taylor, and assault and battery.

### III. Legal Standard

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  Showing that there is come metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rather, the nonmoving party must

present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion.  See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50.  Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings.  Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

   The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law."  In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52).  The Court "must view the evidence in the light most favorable to the non-moving party."  Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).  Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact.  See Anderson, 477 U.S. at 255.  Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted.  Thompson v. Ashe, 250 F.3d 399, 405 (6 th Cir. 2001).

## IV. Discussion

### A. 42 U.S.C. § 1983 Generally[4]

---

[4] Section 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other

Section 1983 on its own creates no substantive rights; rather, it is a vehicle by which a plaintiff may seek redress for deprivations of rights established in the Constitution or federal laws.  Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979).  "To successfully establish a claim under § 1983, a claimant must show that he or she was deprived of a right secured by the Constitution and the laws of the United States by one acting under the color of law."  Ahlers v. Schebil, 188 F.3d 365 (6th Cir. 1999) (internal citations omitted).

### B. Excessive Force

Count I of the complaint claims that Minard, Shewchuk, and Helvey violated Marvin's constitutional right to be free from the use of excessive force throughout the course of his arrest and detention.  Use of excessive force is a violation of the Fourth Amendment.[5]

The officers say that their actions were reasonable and did not rise to the level of excessive force because:  (1) Marvin was intoxicated, uncooperative, and combative beginning at the traffic stop through booking and chemical testing; (2) Marvin lashed out violently at the officers both kicking Helvey and punching Shewchuk.  Furthermore, the officers say that they are entitled to qualified immunity because their actions were objectively reasonable in light of the situation they faced.

---

proper proceeding for redress. . . .

42 U.S.C. § 1983.

[5] The Fourth Amendment provides, in pertinent part, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."  U.S. CONST. amend. IV.

Marvin says that the officers unreasonably used excessive force because, in spite of the fact that he informed them that he had a shoulder injury and requested that the officers handcuff him in front of his body, the officers pulled and wrenched his arms behind his back at several times during the arrest and forced him face-down onto the police car. Marvin, therefore, says that summary judgment is inappropriate because the parties disagree about material facts concerning the scene of the arrest and the subsequent events that took place the police station.

### 1. Legal Standard

In <u>Graham v. Connor</u>, 490 U.S. 386 (1989), the U.S. Supreme Court articulated the standard required to determine whether the force used to effect a seizure is reasonable under the Fourth Amendment. The Supreme Court noted that such a determination "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." <u>Id</u>. at 396 (internal quotation and citation omitted).

A bright-line test is not employed to determine what is "reasonable" under the Fourth Amendment. Rather, the Court must pay careful attention to the facts and circumstances of each case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Id</u>. The reasonableness of a use of force is judged from the perspective of a reasonable officer on the scene. <u>Id</u>. "The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." <u>Id</u>. at 397. This calculus takes into consideration

10

"the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. "Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers, violates the Fourth Amendment." Id. at 396 (internal quotation and citation omitted).

In addition, even assuming there has been a violation of rights, the Court must determine whether the defendant officers are shielded from liability by the doctrine of qualified immunity. "Qualified immunity is a governmental official's right not to stand trial or face the other burdens of litigation. Saucier v. Katz, 533 U.S. 194, 200 (2001) (internal quotation and citation omitted). Saucier set out a two-prong test for qualified immunity: (1) the Court must determine, when taken in the light most favorable to the party asserting the injury, if the officers' conduct violated a constitutional right; (2) if so, the Court must decide if the right was clearly established in the specific instance. Saucier, 533 U.S. at 201. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

**2. Analysis**

The evidence provided by the parties demonstrates a disagreement as to material facts that, when viewed in a light most favorable to Marvin, indicates that summary judgment is improper. First, the parties dispute whether or not the officers acted reasonably by forcing Marvin's arms behind his back to handcuff him because the

11

use of handcuffs is discretionary in misdemeanor arrests.[6]  Minard Dep. p. 10.  The
parties also part ways when recounting whether Marvin requested to be handcuffed with
is arms in front of his body.  Second, the parties disagree in regard to Helvey's
participation in the arrest and whether Marvin physically assaulted Helvey by kicking
him in the shin.  Third, Marvin contests, the witness, Roman's interpretation of the
events that day and says that his account is inaccurate.  Roman's testimony is critical
because it establishes at which point Marvin because resistive, and thus is
determinative of whether the officers reacted reasonably by resorting to force.

Defendants make much of video clips of certain events contained on a CD
submitted to the Court, which they say clearly shows plaintiff's ability to voluntarily place
his arms behind his back at the station after his arrest.  Defendants argue that as a
result, plaintiff's refusal to do so at the time of his arrest demonstrates that the officers
were justified in using force in placing his arms behind his back.

The Court has reviewed the video clips.[7]  In particular, it paid close attention to
the clip referenced in defendants' filing entitled "bkgbench 1."  Defendants'
supplemental filing refers to a clip entitled "Walking out of cell 1," which does not appear
on the Court's CD (see n. 7 supra).  It is assumed that these are the same clips.

_____

[6] The officers did not discover that Marvin possessed a weapon in his vehicle
until after they restrained him and placed him in the patrol car.  Initially, the officers only
arrested Marvin for Operating While Intoxicated, which is a misdemeanor.

[7] The video clips, 12 in total, were submitted by defendants to the Court on a CD.
The CD also contained audio clips.  It is not clear whether the CD lodged with the Court
is the same CD given to opposing counsel.  In plaintiff's supplemental response to
defendants' motion, plaintiff's counsel refers to a clips entitled "walking out of cell 1" and
"walking to cell 2" and "booking room 1."  No such titled clips appears on the CD given
to the Court.

Defendants say that because plaintiff was able to voluntarily put his hands behind his back during booking, there is no genuine issue of material fact that the officers' actions during his arrest - in placing his arms behind his back when plaintiff allegedly refused to do so - were objectively reasonable. The Court disagrees with defendants' characterization of the events. The clips do not show plaintiff putting his arms behind his back, but rather show plaintiff putting his left arm to the side and an officer taking his arm and putting it behind his back. The officer then does the same with plaintiff's right arm.

Defendants also say that the video clips clearly show plaintiff was resistive. Plaintiffs vigorously dispute this allegation and say that the clips show the opposite - that plaintiff did not resist and the only movement he made was to lift his head off the counter and a slight rotation of his torso. Plaintiff's interpretation of the events is not unreasonable. In short, the video clips are not the conclusive evidence defendants purport them to be. They leave room for interpretation and must be fleshed out by testimony.

To resolve the disputed versions of the events, the Court would be required to determine which witness is more credible, which is a function of the trier of fact and cannot be determined on summary judgment. See Anderson, 477 U.S. at 255. Based on the record, the Court cannot say that there is no genuine issue of material fact with respect to Marvin's excessive force claim. Indeed, the Court of Appeals for the Sixth Circuit has counseled against granting summary judgment under circumstances like those presented here. See Adams v. Metiva, 31 F.3d 375 (6th Cir. 1994) (reversing district court's grant of summary judgment in a 42 U.S.C. § 1983 case when the parties

13

offered differing versions of the events giving rise to, <u>inter alia</u>, plaintiff's excessive force claim).

Additionally the officers' defense of qualified immunity must also fail on summary judgment because a material dispute of facts exists.  First, courts have determined that there exists a right to be free from excessive force during arrest.  <u>See</u> <u>Solomon v. Auburn Hills Police Dep't</u>, 389 F.2d 167 (6th Cir. 2004).  The second prong of the <u>Saucer</u> test, therefore, is more relevant to the instant case.  The officers must show that a reasonable officer would not believe that his actions violated Marvin's Fourth Amendment right.  The parties strongly disagree whether the officers acted reasonably while forcing Marvin's hands into the handcuffs.  Marvin says that he was fully cooperative with the arresting officers and asked them not to handcuff him behind his back.  He says that he began to lash out verbally at the officers only after they abusively forced him onto the hood of the police car, injuring his shoulder.  The officers say that their actions were objectively reasonable because Marvin was intoxicated and combative.  They point to Roman's testimony to support their contention that Marvin was uncooperative prior to his arrest during the field sobriety tests.  The question remains; at what point did Marvin become obstinate?  The evidence of record does not lead to an undisputed resolution.  If Marvin was fully cooperative until the officers handcuffed him, an objective officer may have found Minard, Shewchuk, and Helvely's actions to be a violation of the Fourth Amendment.  The Sixth Circuit has recognized that the Fourth Amendment requires officers to use "the least intrusive means available" when apprehending an individual.  <u>Burchett v. Keifer</u>, 310 F.3d 937, 946 (6th Cir. 2002).  Accordingly, the parties' incongruent versions of events relating to Marvin's arrest must

14

be resolved by the trier-of-fact and cannot be decided by the Court on summary judgment. See Anderson, 477 U.S. at 255.

### C. Failure to Train, Discipline and Adopt Adequate Policies and Procedures

Count III of the complaint alleges that the City acquiesced in the use of excessive force on the part of its officers because it failed to properly investigate citizen complaints and train police officers.

The City says that it cannot be held liable because: (1) Marvin has not demonstrated that the City adopted the use of excessive force as a policy or practice; (2) any deficiency in the training and discipline program was not the actual cause of Marvin's injuries nor was is closely related.

Marvin says that the City's failure to investigate a claim of assault on a detainee demonstrates an official policy of depriving a prisoner of his constitutional rights. Furthermore, Marvin says that the TPD, including Helvey in his position as commander, was deliberately indifferent to the actions of its officers, and moreover the officers' lack of proper training was closely related to Marvin's injuries.

### 1. Legal Standard

Liability will extend to municipalities and government agencies under § 1983 when the "action alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers." Monell v. Dep't of Soc. Serv., 436 U.S. 658, 690 (1978). To hold the municipality liable for the actions of its officers, a "plaintiff must identify a municipal 'policy' or 'custom' that caused the injury. Board of County Comm'rs of Bryan County, Okla. v. Brown, 520 U.S. 397, 397 (1997). Moreover, "the plaintiff must also

15

demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Id. (internal citation omitted). A municipality may, however, be liable for unconstitutional actions of its officers when the policy promoting the constitutional deprivation is a custom, though not officially adopted. Monell, 436 U.S. at 690.

Additionally, in cases when a plaintiff seeks to hold a municipality liable for inadequately training its officers, the plaintiff must prove "the training program at issue is inadequate to the task that the officers must perform; that the inadequacy is the result of the City's deliberate indifference; and that the inadequacy is closely related to or 'actually caused' the Plaintiff's injury. Russo v. City of Cincinnati, 953 F.2d 1036, 1046 (6th Cir. 1992). (internal citation omitted).

## 2. Analysis

As more fully set forth in defendants' supplemental paper and the affidavit of Helvey, the TPD has adopted policies and procedures that describe expected officer behavior in situations similar to Marvin's arrest. The TPD instructs officers on proper methods when using force to handcuff an individual. The TPD has an internal affairs bureau to investigate citizen complaints of officer misconduct. A copy of the policy and procedures manual is distributed to all new officers, and each is trained for four months by a field training officer. All actions of the new officers are observed and documented during this four-month period. The newly hired officers are then tested and placed on probation for one year. As an added measure, the supervisor and Commander read and review each of the daily police reports.

16

Marvin, however, says that the TPD new officer training policies and procedures are inadequate because the policies fail to dictate a procedure for handcuffing disabled persons, and that the TPD fails to properly investigate all citizen claims.

Marvin also relies on Exhibit 10, a listing of 20 cases filed against Taylor and/or its officers for civil rights violations since 2000. At the hearing, the Court inquired as to whether this amount of lawsuits was disproportionate such that they might tend to show a policy or custom of mishandling excessive force complaints. Plaintiff then filed a supplemental paper providing further statistical analysis of the number of cases filed against Taylor and its officers which is contained in Exhibit 13 and 14.

The statistics supplied by Marvin fall short of establishing a genuine issue of material fact as to Taylor's liability. In Thomas v. City of Chattanooga, 398 F.3d 426 (6th Cir. 2005), the Court of Appeals for the Sixth Circuit discussed the use of considering the number of civil complaints in establishing municipal liability under § 1983. In Thomas, the plaintiff sought to establish the City's liability with an expert, who reviewed statistical evidence of complaints and civil cover sheets from lawsuits filed against the police department and found that there were 45 lawsuits since 1994 which alleged excessive force against the police department and therefore concluded that there must be a policy of condoning the use of excessive force. The district court rejected the expert's opinion as conclusory. The Sixth Circuit agreed, stating:

> The civil complaints which [the expert] evaluated ranged from a shooting to a broken fingernail, but [the expert] did nothing to inform the court as to whether most of the complaints were serious or frivolous. [The expert] also failed to explain how one could evaluate the mere number of complaints in a vacuum to come to a conclusion about the Department's policies. Moreover, [the expert] failed to present any "data upon which the Court could compare or contrast the number of excessive force complaints in similarly-sized cities or in cities with a

17

similarly sized police force."

Thomas, 398 F.3d at 430 (quotation in original).

The same flaws in the expert opinion in Thomas are present here.  Marvin furnishes raw data in the form of the number of civil rights complaints against Taylor since 2000 (20 cases) and the number of civil rights cases filed as a whole during the last five years (490).  Marvin then takes this number (490) and calculates an average number of complaints per the 630 cities in Michigan, arriving at .777 complaints per year.  Because Taylor's average is 4 per year, plaintiff says this is indicative of an unconstitutional policy.  Marvin makes similar calculations for the number of complaints against individual police officers, taking the number of state-wide police officers.  These numbers are meaningless.  First of all, Marvin has not compared Taylor's statistics with the statistics of similarly sized cities.  A state-wide comparison is simply insufficient.  Marvin has also taken an over-broad approach by looking at all types of civil rights cases instead of focusing on excessive force cases.  Moreover, of the 20 cases filed against Taylor and its officers in the past 5 years, Marvin has not indicated whether these cases involved the use of excessive force or provided any other factual information about these cases.  Defendants indeed point out that at least one of them involved a jail suicide.

Marvin also relies on a statement by former Taylor Commander Thomas Bonner in a deposition for a different § 1983 case as indicative of Taylor's failure to provide adequate procedures to deal with police officer misconduct.  Marvin says Bonner testified as follows:

            ...Because although we may seem like a big department, and we are by,

18

> you know, size, we are not that big and we don't know what our people or who
> our troublemakers are, who are our eggheads are.

Marvin says that this statement shows Taylor does not want to look at or care who its

troublemakers are within the department.

    This is a gross mischaractierization of Bonner's testimony.  He testified as

follows:

> ...Because although we may seem like a big department, and we are by, you
> know, size, we are not that big **that** we don't know what our people or who our
> troublemakers are, who are our eggheads are.

Thus, Marvin cannot rely on Bonner's testimony as evidence of municipal liability.

    Marvin also argues that the TPD failed to properly train and discipline Minard,

which resulted in six lawsuits against the officer in the four years that he has been

employed by TPD.[8]  The fact that Minard has been sued, standing alone, does not

establish liability on the part of the city.  Additionally, Marvin says that Helvey failed to

properly investigate citizen complaints, and therefore engaged in a pattern of  "ostrich-

like" behavior regarding the overly-aggressive behavior of Minard."  Marvin, however,

has no evidence to support these allegations and had failed to demonstrate that the City

adopted, ratified, or endorsed such actions.  The City has a well outlined procedure for

training its officers in order to prevent harm to arrestees.  Newly hired police officers

participate in a mandatory four month field training program, when they are provided

with a manual of the TPD policies and procedures, required to pass an examinations,

---

[8] Two of the six cases were resolved by summary judgment in favor of the
officers, and another two were dismissed.

and placed under a one-year probationary period.  The TPD also trains its officers in methods of handling disabled and older prisoners.  Likewise, Marvin has not provided evidence that establishes even a tacit adoption of the use of excessive force as an official City policy or custom regardless of whether the City approved specific policies for handcuffing the disabled.

Overall, in light of the record, Marvin cannot establish that the City officially adopted a custom or policy that deprived him of his constitutional rights.  There is no evidence that the TPD's policies or customs were the "moving force" behind Marvin's injuries and summary judgment must be granted.  Board of County Comm'rs of Bryan County, Okla., 520 U.S. at 397.

Furthermore, to prove municipal liability in this case, Marvin must show that the City's training program is inadequate, the City was deliberately indifferent; and that the inadequacy in the training program is closely related to his injury.  Russo, 953 F.2d at 1046.  Even when viewed in the light most favorable to Marvin, the evidence does not establish deliberate indifference on the part of the City.  The City implemented policies and procedures designed to prevent the type of excessive force Marvin says he was a victim of, and further, no element of City's training policy was closely related to Marvin's injuries.  As a result, the City is entitled to summary judgment on Marvin's claim for failure to train, discipline, and adopt adequate policies and procedures.

### D. State Law Assault and Battery

Count V of the complaint alleges a pendant state claim of assault and battery. The officers say that their actions were reasonable in light of the situation because Marvin was intoxicated and physically lashing out at them.  Marvin says that the officers

actions were unreasonable and amounted to assault and battery because they ignored his reasonable request to be handcuffed in front of his body and then agitated his injuries by using unnecessary force.

## 1. Legal Standard

The elements of assault and battery in the State of Michigan are: (1) assault is intentional threat of force or bodily injury against another that causes the victim to sense immediate danger of imminent harm, and the aggressor has the present ability to effectuate the threatened action; (2) battery is the intentional infliction of unwanted bodily contact by the aggressor, or an object put in motion by the aggressor, on the victim.  Tinkler v. Richter, 295 Mich. 396, 403 , 295 N.W. 201, 203 (Mich. 1940).

## 2. Analysis

For the reasons stated above under section B: Excessive Force, the evidence provided by the parties exhibits a genuine dispute of material fact and summary judgment as to assault and battery is improper at this time.

## V. Conclusion

For the foregoing reasons, summary judgment unsuitable on the counts of excessive force and assault and battery.  Summary judgment is, however, granted in favor of the City in regard to Marvin's allegation of inadequate training, policies, and procedures.  Accordingly, count II, claiming denial of access to reasonable medical care, and count IV, claiming denial of due process are dismissed by stipulation of the parties.  Count III, claiming liability on the part of the City for failure to train and discipline its officers, is dismissed, and the City no longer remains a party to the suit. Finally, counts I and V continue, claiming that the officers violated Marvin's Fourth

21

2:05-cv-70367-AC-DAS   Doc # 21   Filed 06/26/06   Pg 22 of 22   Pg ID 518

Amendment right to be free from excessive force and the pendent state law claim of assault and battery.  Minard, Helvey, Shewchuk, and Officer John Doe(s) remain parties in the case.

      SO ORDERED.


Dated:  June 26, 2006           s/Avern Cohn_____
                                    AVERN COHN
                                    UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, June 26, 2006, by electronic and/or ordinary mail.

                                s/Julie Owens_____
                                    Case Manager
                                    (313) 234-5160